

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00257-CR
_____

TRACIE DANIELLE ALPHIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 25451

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

In rural Hunt County, during the course of robbing Jason Herrington of his car, Tracie Danielle Alphin fired multiple gunshots at a running Herrington, wounding him in the foot and stopping his flight. Alphin's associate, David Hickman, then shot Herrington in the temple, killing him. Alphin and Hickman fled the scene in Herrington's car, which was later sold for drugs. Alphin was convicted by a jury of capital murder and was sentenced to life in prison without the possibility of parole. We affirm the judgment of the trial court because (1) the evidence is legally sufficient to support Alphin's conviction as a party to capital murder, (2) the trial court did not err in refusing to submit lesser-included offenses in the jury charge, and (3) no claim of improper prosecutorial comment during closing argument was preserved for review.

*(1)* *The Evidence is Legally Sufficient to Support Alphin's Conviction as a Party to Capital Murder*

Alphin claims the evidence was insufficient to prove she was guilty as a party to capital murder. *See Hudson v. State*, 366 S.W.3d 878, 881 (Tex. App.—Texarkana 2012, pet. granted) (appellate court must always address challenges to sufficiency of evidence). In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction

2

of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

The fateful course of events leading to Herrington's death began on the morning of October 19, 2008. Alphin's and Hickman's versions of the story differ considerably. According to Alphin, that morning Hickman and Herrington, drove Herrington's car to "Pop's" house,[1] where Alphin was staying. While Alphin had known Hickman for about two years, she had not previously met Herrington, who was driving. At Pop's, Hickman and Alphin walked around to the back of the house and, while they were using drugs, talked about Alphin's need for money and about stealing Herrington's car. The three then left Pop's and drove to Walmart[2] to get some gas.[3] They next went to Alphin's father's house, where Alphin stole a gun and hid it in her purse. When she returned to the car, Alphin handed the gun to Hickman, who was going to sell it for her. As the three drove the country roads outside Quinlan, Hickman wanted to stop and

---

[1]The individual called "Pop" was identified at trial by only that name.

[2]Wal-Mart Stores, Inc., is the name of the company, but it uses the name Walmart, which we do herein.

[3]Herrington was driving, Alphin was in the passenger seat, and Hickman was in the backseat.

smoke methamphetamine. Herrington stopped the car close to the intersection of two country roads. At some point after the three emerged from the car, Herrington began to run from Hickman and Alphin. Alphin shot at Herrington three or four times as he was running. Alphin stated, "I was trying to just scare him and shoot him in the leg . . . . That was the plan." She denies having shot Herrington in the head. Herrington was hindered in his escape by briars in a ditch. As Alphin and Hickman approached, Alphin asked Herrington if he was hit. Herrington, holding his leg, responded that he was hit. Hickman told Alphin to give him the gun. As Alphin walked away, Hickman shot Herrington in the head, killing him. Alphin indicated she was part of a plan to rob Herrington of his car, although she claimed it was not supposed to happen in the way it did.

In Hickman's version of events,[4] on the fateful day, Hickman was at Pop's house when Herrington and Alphin showed up together in Herrington's car. Hickman testified that he spoke with Alphin at Pop's house, but she said nothing about stealing Herrington's car.[5] Alphin did, however, tell Hickman she needed money. Alphin and Hickman left Pop's house with Herrington driving and went to a local pawn shop, where Alphin unsuccessfully attempted to sell a laptop computer. The three then drove to Walmart to get gas for Herrington's car. Alphin attempted to persuade Herrington to leave his keys in the vehicle, but Herrington refused. While Herrington was in Walmart, Hickman and Alphin talked about taking Herrington's car, although

---

[4]Hickman is currently serving a life sentence for the capital murder of Herrington.

[5]During an interview with investigators, Hickman indicated that he and Alphin had a plan to rob Herrington of his car.

there was no discussion about how that would be accomplished. Likewise, there was no discussion of a gun.

After leaving Walmart, the trio drove to Alphin's father's house. Hickman and Herrington waited in the car while Alphin went inside. Hickman did not realize Alphin had taken a gun from the house and placed it in her purse until Alphin handed Hickman her purse and asked him to find her cigarettes. While Hickman saw the gun, there were no cigarettes in the purse, which he handed back to Alphin. At some point after that, as the three were driving down a country road heading for Quinlan, Hickman asked Herrington to stop the car so he could relieve himself. When Hickman turned around to get back in the car, Alphin was pointing a gun at Herrington, ordering him out of the car. Herrington did so and started to walk down the road away from Alphin and Hickman. When Alphin, now out of the car, fired shots at Herrington, he began to run. Alphin proceeded to walk behind Herrington, shooting at him. Initially, Herrington ran down the road, but then veered toward the brush as Alphin followed.

Hickman was unsure of the number of shots fired, but it was "a lot." One of the shots hit Herrington in the foot. After Herrington ran into the woods, Hickman, who was standing at the ditch on the side of the road watching, saw Alphin shoot Herrington in the face. As Hickman approached, he could see part of Herrington's face was "messed up," but Herrington was still alive. Then Alphin handed Hickman the gun, and Hickman shot Herrington in the head. He did this because Herrington was still alive, after having been shot in the face. He then stated, "I don't know what I shot him for, I just shot him."

By both accounts, Alphin and Hickman fled the scene in Herrington's car. When they arrived in Quinlan, they drove to the home of an individual to whom they sold the gun for drugs. Hickman[6] also sold the car for drugs.

Reade Quinton, M.D., a Dallas County medical examiner who performed Herrington's autopsy, testified that two injuries were located on Herrington's body—a gunshot wound to the right temporal region and a gunshot wound to the left foot. The wound to the right temporal region was caused by a bullet that entered the right temple and exited through the left base of the skull (right to left and downward). The cause of death was a gunshot wound to the head. Quinton expressed the opinion that, because there are no wound tracks and no exit defect, it is highly unlikely there was a second gunshot wound to the head.[7]

Alphin claims in three multifarious points that the evidence is insufficient to show she is guilty as a party to Herrington's murder.[8] First, Alphin claims she did not intend to kill Herrington. Alphin next claims she did not solicit, encourage, direct, aid, or attempt to aid

---

[6]Hickman has previously been hospitalized at Terrell State Hospital, where he was diagnosed as a bipolar schizophrenic with homicidal tendencies.

[7]Laura Simmons, a Texas Ranger assisting in the investigation of Herrington's death, testified that she believed there was a third bullet wound to Herrington's face. The bullet that entered the temple ended up in the back of the head, and would not have caused injury to the left side of the face, where an orbital bone is missing and there is a defect to the nose. This opinion is based on Simmons' training and experience, including the study of forensics, involving the examination of over 200 bodies in various states of decomposition. These studies were conducted to determine damage from weapons and pattern injuries. In this case, because Herrington's body was not located until November 24, 2008, it was in an advanced state of decomposition.

[8]The indictment alleged that Alphin,

> acting individually and together with David Earl Hickman intentionally and knowingly cause[d] the death of an individual, namely: Jason Lee Herrington, by shooting him with a firearm; namely a handgun, and the murder of Jason Lee Herrington was committed intentionally in the course of committing or attempting to commit robbery. . . .

Hickman in the commission of the capital murder. Finally, Alphin alleges that, while the court's charge defined the law of the parties in the abstract, the application paragraph did not incorporate those legal definitions. Specifically, the jury was not required to determine the manner in which Alphin acted as a party, and this, she claims, is error.

### (a) The Evidence is Legally Sufficient to Show Intent to Promote or Assist the Commission of Intentional Murder

A person commits the offense of capital murder if he or she intentionally or knowingly causes the death of an individual while committing certain offenses, including robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2012). The evidence plainly shows that Herrington was killed during the course of a robbery. The real issue Alphin raises is whether the evidence is sufficient to show that Alphin is criminally responsible for the murder committed by Hickman. In order to prove this, the evidence must show that,

> acting with intent to promote or assist the commission of the offense, [the accused] solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). Alphin contends the evidence does not show any act on her part that promoted or assisted Hickman in the commission of capital murder.[9] She further claims that, because Hickman never informed her of his intent to shoot Herrington in the head, she could not have known his unlawful intent to kill and, therefore, could not have acted to promote or assist him in that act.

---

[9]In this case, the offense of capital murder requires proof that the person intentionally or knowingly caused the death of an individual in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2).

7

To convict Alphin of capital murder as a party pursuant to Section 7.02(a)(2) of the Texas Penal Code, the State had to prove Alphin harbored the specific intent to promote or assist the commission of an intentional murder. *See Lawton v. State*, 913 S.W.2d 542, 555 (Tex. Crim. App. 1995), *overruled on other grounds*, *Mosley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998); *Stroman v. State*, 69 S.W.3d 325, 329 (Tex. App.—Texarkana 2002, pet. ref'd). Stated differently, there must be evidence that supports a finding, beyond a reasonable doubt, that Alphin intended the death of Herrington and that she assisted Hickman in causing that death. *See Ex parte Thompson*, 179 S.W.3d 549, 555 (Tex. Crim. App. 2005) (state of mind of accomplice may differ from that of principal, and they may thus be guilty of different offenses).

The State may use direct or circumstantial evidence to prove the defendant's responsibility as a party to the offense. *Rivera v. State*, 12 S.W.3d 572, 575 (Tex. App.—San Antonio 2000, no pet.). In determining whether an individual is a party to an offense and thus bears criminal responsibility, the court may look to events before, during, and after the commission of the offense. *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). In the present case, it is patently clear Alphin and Hickman were in the process of and did actually commit a robbery by stealing Herrington's car.[10] It is also clear that Hickman fired the shot resulting in Herrington's death. Thus, the only remaining issue is whether Alphin intended to promote or assist the commission of Herrington's murder.

On the day Herrington was killed, Alphin and Hickman agreed to steal Herrington's car. When Herrington failed to leave his keys in the car at Walmart, Alphin took a gun from her

---

[10]Alphin admitted that she was part of the plan to rob Herrington of his car on the day of his murder.

8

father's house and returned to the car with the gun secreted in her purse. Alphin handed her purse to Hickman, who viewed the gun. Alphin and Hickman then directed Herrington to drive to a remote, rural location where Alphin admits she pointed the loaded gun at Herrington and fired at him as he attempted to flee.

Simmons testified that, based on Alphin's version of events, Alphin checked the gun[11] to be sure a bullet was lodged in the chamber before she began shooting at Herrington.[12] The act of ensuring the gun was loaded was an "affirmative act," which, according to Simmons, was indicative of Alphin's desire to shoot Herrington. Alphin admitted that she shot repeatedly at Herrington as he was running. Alphin also repeatedly claimed she had no experience with guns. Later, Alphin indicated she knew how to handle a gun.

Further, when Herrington got out of the car and began to walk away, Alphin and Hickman could have easily taken the car without resorting to violence. Alphin, nevertheless, fired at Herrington as he fled and wounded him.[13] By shooting Herrington in the foot, Alphin impeded his ability to continue to flee, making him an easier target. Alphin then handed the loaded weapon to Hickman, within mere feet of Herrington, who could no longer flee due to his injury. After Hickman inflicted the fatal wound, he and Alphin fled the scene in Herrington's car.

---

[11]The gun was a Ruger P95 9mm semiautomatic pistol.

[12]An unspent bullet was located on the roadway. When the slide is pulled back in a semiautomatic gun such as this, it loads a bullet into the chamber. If the slide is pulled back with a bullet in the chamber, the bullet will be ejected from the chamber.

[13]Judging by the amount of blood she observed, Alphin thought she may have shot Herrington in the chest.

Whether Alphin possessed the intent to kill Herrington was a question of fact for the jury to determine. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). The jury may infer the intent to kill from any evidence that is believed to prove existence of that intent. *Id.* Intent can be inferred from such circumstantial evidence as the person's acts, words, and conduct because "[o]ne's acts are generally reliable circumstantial evidence of one's intent." *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). The jury may also infer intent to kill from the defendant's use of a deadly weapon, such as a gun. *Brown*, 122 S.W.3d at 800–01; *Lay v. State*, 359 S.W.3d 291, 295 (Tex. App.—Texarkana 2012, no pet.).

When viewed in the light most favorable to the jury's verdict, these facts are sufficient for a rational jury to find that Alphin intended the death of Herrington and that she assisted Hickman in causing Herrington's death. Thus, the evidence is sufficient to show that Alphin acted with the intent to promote or assist the commission of capital murder.

> (b)  *The General Reference to the Law of the Parties in the Application Paragraph Was Not Error*, *in the Absence of an Objection by Alphin*

Alphin next complains that the law of the parties, having been submitted only in the abstract portion of the charge and not in the application paragraph, was insufficient to direct the jury to specific conduct for which criminal party responsibility could be determined. The abstract portion of the charge contained the following instructions on the law of the parties:

> A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, by the conduct of another for which she is criminally responsible, or both.
>
> Each party to an offense may be charged with the commission of an offense. A person is criminally responsible for an offense committed by the conduct of

10

another, if acting with intent to promote or assist the commission of an offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

Mere presence alone will not constitute one a party to an offense.

The application paragraph instructed the jury to determine that, if

Tracie Danielle Alphin, did then and there acting individually and/or together with David Earl Hickman, intentionally cause[] the death of an individual, Jason Lee Herringon, [sic] by shooting him with a firearm; namely a handgun, and the murder of Jason Lee Herringon [sic] was committed intentionally in the course of committing or attempting to commit robbery, you shall find the defendant "Guilty" of the offense of capital murder as alleged in the indictment.

No objection was lodged to this alleged error in the jury charge.[14] Likewise, no objection was made when the charge was read to the jury. In a similar case, there was no objection to the application paragraph instructing the jury to find the defendant guilty of murder if, "either acting alone or together" with his co-actor, he killed the victim. *Marvis v. State*, 36 S.W.3d 878, 879–80 (Tex. Crim. App. 2001). The abstract portion of the charge stated,

All persons are parties to an offense who are proven beyond a reasonable doubt to be guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense,

---

[14]Alphin also apparently claims that the trial court erred in failing to submit an "independent impulse" instruction, and that this should have been done, citing *Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001). In that case, the court determined there is no enumerated defense of "independent impulse" in the Texas Penal Code, and the proposed defensive issue would simply negate the conspiracy liability element of the State's case. "All that is required, then, is for the appropriate portions of the jury charge to track the language of § 7.02(b)." *Id*. Additionally, there is nothing in the record to suggest Alphin requested such an instruction.

11

he solicits, encourages, directs, aids, or attempts to aid the other to commit the offense. Mere presence alone will not constitute one a party to an offense.

*Id.* at 880. The court reasoned that the use of the phrase "acting together" in the application paragraph references the abstract portion of the charge, which equates "acting together" with "party." *Id.* Accordingly, the jury could refer to the abstract party definition to determine whether Marvis was criminally responsible for the conduct of his co-actor. *Id.* Thus, there was no showing that the phrase "acting together" in the application paragraph, as opposed to setting out the law of the parties, caused egregious harm.[15] *Id.*

Here, the application paragraph uses the phrase "acting individually and/or together with David Earl Hickman." As in *Marvis*, the phrase "acting . . . together with David Earl Hickman," references the abstract portion of the charge which equates "party" with commission of the offense "by [Alphin's] own conduct, by the conduct of another for which she is criminally responsible, or both." In light of the recent case of *Vasquez v. State*, No. PD-0321-11, 2012 WL 4511366 (Tex. Crim App. Oct. 3, 2012), this submission, in the absence of objection, is not error.

In that case, Vasquez was charged with aggravated robbery. *Id.* at *1. The abstract portion of the charge defined the law of the parties, and the application paragraph stated that the jury should find Vasquez guilty if he was "acting alone or as a party (as herein defined)" in commission of the aggravated robbery. *Id.* On appeal of his conviction, the court of appeals found reversible error because, although Vasquez objected, the trial court refused to apply the

---

[15]If, on the other hand, the application portion of the charge fails to mention the law of the parties "either directly or by reference . . . for an offense committed by the conduct of his codefendant," such charge is erroneous. *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik*, 953 S.W.2d 234.

law of the parties more explicitly in the application paragraph. *Id.* at *5. The high criminal court concluded that the usual *Almanza*[16] factors apply to objected-to error in the application paragraph. *Id.* at *6. In reaching this conclusion, the court summarized,

> [A] general reference to the law of the parties in the application paragraph is sufficient and is not error when the defendant does not object and request a narrowing of the specific statutory modes of conduct that constitute party liability—whether he "solicited, encouraged, directed, aided or attempted to aid" another specified person to commit the offense. But if the defendant does request that the application paragraph refer *only* to those specific party-liability acts that are supported by the evidence, then he is entitled to such a narrowing.

*Id*. at *5. Here, the law of the parties is referenced in the application paragraph. Because there was no objection and request to narrow the specific statutory modes of conduct that constitute party liability, there is no error in the submission of the law of the parties in the jury charge.

Even if we were to construe this submission as error, such error would not be egregious under *Almanza*. In *Marvis*, the court found error in the submission of the application paragraph that Marvis acted "individually or together with" his co-actor; the error was not, however, egregious. *Marvis*, 36 S.W.3d at 879. When there is no objection to the jury charge, *Almanza* requires that

> the actual degree of harm [concerning jury charge error] must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.

*Almanza*, 686 S.W.2d at 171. The error in the *Marvis* submission was not found to be egregious because, as previously discussed,

---

[16]*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

the jury charge connected "acting together" with the complete definition of "criminal responsibility," including the requisite culpable mental state. The charge did not relieve the state from proving the *mens rea* element necessary to be convicted as a party or authorize the jury to convict appellant only as a principal.

*Marvis*, 36 S.W.3d at 880. The same analysis applies here.

In addition, in closing argument, the State pointed out specific acts Alphin was alleged to have done in order to promote, assist, encourage, or aid Hickman in killing Herrington. Such acts—for which evidence was presented during the trial—included the plan to steal Herrington's car, stealing her father's gun, making sure the gun was loaded, failing to drive away after Herrington left the car, shooting at Herrington as he was running from her, hitting Herrington in the foot, handing Hickman a loaded gun, taking the car after he was killed, and selling the gun after the killing and dividing the drugs received for it. Error, if any, in the submission of the charge was not egregious.

*(2)* *The Trial Court Did Not Err in Refusing to Submit Lesser-Included Offenses in the Jury Charge*

Alphin claims the trial court harmfully erred in not including requested instructions on the lesser-included offenses of murder, attempted capital murder, and aggravated assault with a deadly weapon. The indictment charged that Alphin

> acting individually and together with David Earl Hickman intentionally and knowingly cause[d] the death of an individual, namely: Jason Lee Herrington, by shooting him with a firearm; namely a handgun, and the murder of Jason Lee Herrington was committed intentionally in the course of committing or attempting to commit robbery. . . .

The elements of robbery, as submitted in the jury charge, allowed for a finding of robbery if the jury found that, in the course of committing theft and with the intent to obtain or maintain control

of property of another, Alphin intentionally or knowingly caused bodily injury to another. Theft was defined as "the unlawful appropriation of the corporeal personal property of another with the intent to deprive such other person of said property." To convict Alphin of capital murder, the State had to prove she intentionally committed murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). A person commits robbery if, in the course of committing theft with intent to obtain or maintain control of property, he or she (1) intentionally, knowingly, or recklessly causes bodily injury, or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE ANN. § 29.02(a) (West 2011).

We review for an abuse of discretion the trial court's denial of a request to include a lesser-included offense in a jury charge. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). To be entitled to a lesser-included-offense charge, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Hampton v. State*, 109 S.W.3d 437, 440 (Tex. Crim. App. 2003). Further, there must be evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he or she is guilty only of the lesser-included offense. *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). The evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Cornet v. State*, 359 S.W.3d 217, 229–30 (Tex. Crim. App. 2012). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Ferrel v. State*, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001). In making this decision, courts do not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Hall v. State*,

15

158 S.W.3d 470, 473 (Tex. Crim. App. 2005). If the record contains evidence that, if believed by the jury, negates or refutes an element of the greater offense or is subject to different interpretations by the jury, a defendant can qualify for a lesser-included-offense instruction. *Saunders v. State*, 840 S.W.2d 390, 391-92 (Tex. Crim. App. 1992). Such an instruction is not warranted, however, by simply disbelieving evidence proving an element of the greater offense. *Hampton*, 109 S.W.3d at 440–41.

(a)     *The Trial Court Did Not Err in Refusing to Submit the Lesser-Included Offense of Murder*

Alphin, charged with capital murder, requested a lesser-included instruction on murder.[17] Murder is a lesser-included offense of capital murder. *McKinney v. State*, 207 S.W.3d 366, 370 (Tex. Crim. App. 2006). Therefore, Alphin satisfies the first prong of the test.

The second prong of the test requires an evaluation of the evidence to determine whether there is some evidence that would permit a jury to rationally find that, if Alphin is guilty, she is guilty only of murder. *See Hall*, 225 S.W.3d at 536. The evidence must establish that murder is a valid, rational alternative to the charged offense of capital murder. *See Cornet*, 359 S.W.3d at 229–30. If there was evidence in this case that Alphin did not commit a robbery, then she would have been entitled to a charge on the lesser-included offense of murder.

At trial, Alphin presented evidence disputing Hickman's testimony that Herrington went into Walmart while Hickman and Alphin discussed plans to steal the car. This evidence consisted of showing the jury an aerial exhibit of the Walmart store in question, demonstrating

---

[17]The crux of the argument supporting this point of error is that the evidence was insufficient to support Alphin's conviction of capital murder. Having previously addressed this issue, we do not reconsider it here.

16

the distance from the gas pumps to the front entrance. Because Hickman testified that Alphin somehow stole the gas from Walmart, Alphin maintains that it is unreasonable to believe that she and Hickman remained at the gas pump until Herrington emerged from the store. Hickman then testified that they drove around to the front of the store to wait for Herrington. Alphin claims the entire Walmart scenario was untrue because there was never a plan to steal the car.

In addition, the gun was wiped clean of fingerprints after Herrington was killed, and Alphin wanted to burn the car after the killing. Hickman opposed that plan because the car would then be worthless. So, Hickman sold the car for drugs, although he was never paid. Alphin maintains this evidence shows that she and Hickman were trying to cover up the murder and that there was never a plan to steal the car. This evidence neither establishes murder as a valid rational alternative to the charged offense nor permits the jury to find that Alphin committed only murder.

In evaluating this evidence in the context of the entire record, we observe that Alphin admitted the plan to rob Herrington of his car. Before Hickman and Alphin left with Herrington from Pop's house, they met at the back of the house and talked about Alphin's need for money and about stealing Herrington's car. When the three stopped the car on a country road, Alphin fired at Herrington as he fled. Alphin's intention to appropriate his vehicle is evidenced by the statement that, "I was trying to scare him and shoot him in the leg . . . . That was the plan." She admits that she was part of a plan to rob Herrington of his car, although she stated it was not supposed to happen as it did. After Herrington was killed, Alphin and Hickman fled the scene in Herrington's car. They, thus, stole the car.

17

Because there is no evidence in the record that would permit a rational jury to find that no robbery occurred, Alphin could not be found guilty only of murder. The trial court did not err in refusing to submit the lesser-included offense of murder to the jury.

(b)     *The Trial Court Did Not Err in Refusing to Submit the Lesser-Included Offense of Aggravated Assault*

Next, Alphin argues that the trial court erred by failing to submit the lesser-included offense of aggravated assault with a deadly weapon in the jury charge. Aggravated assault with a deadly weapon is a lesser-included offense of murder and, therefore, of capital murder. *See Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000); *see also Weaver v. State*, 855 S.W.2d 116, 122 (Tex. App.—Houston [14th Dist.] 1993, no pet.). The further question is whether there is evidence that, if guilty of an offense, Alphin was guilty of only the lesser-included offense. *See Hall*, 225 S.W.3d at 536. This requires some evidence from which a rational jury could acquit Alphin of capital murder while convicting her of the lesser-included offense. *See Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). A specific intent to kill is required in order for capital murder to have been committed. *Id.*

Alphin did not testify at trial; she did, however, give two statements prior to trial regarding her involvement, both of which were admitted as evidence at trial. Initially, Alphin denied firing any shots at Herrington; she claimed Hickman did all of the shooting. In her second statement, however, Alphin admitted to firing the initial round of shots at Herrington while he attempted to flee. She claims she shot at Herrington under duress from Hickman, who allegedly gave her the gun and told her to shoot, or he would shoot her. Alphin stated that she

18

did not know "this was going to happen" and that she did not want to hurt anybody. She maintains she was shooting at Herrington just to scare him. She was not shooting "nowhere truly towards him." She was "aiming around," and "not aiming at him." "We were just supposed to scare him. And David killed him."

When Herrington was in the briars, Hickman said he was alive. Alphin claimed to have wanted to go at that point but indicated that Hickman took the gun and said, "I'll finish him." At that point, Alphin said, "[N]o, let's just go." She claims that she told Hickman not to kill Herrington but that Hickman shot Herrington in the head. Alphin claims, "It wasn't supposed to be like that, though. We were supposed to scare him." She says she did not intend for Hickman to kill Herrington. Alphin steadfastly maintained that "none of this was supposed to happen like this." This is evidence that, if believed by the jury, would indicate Alphin did not harbor the intention to kill Herrington, and, thus, did not possess the requisite mental state necessary to prove capital murder. *See Thompson*, 179 S.W.3d. at 553–54 ("What matters under Section 7.02(a) is the criminal *mens rea* of each accomplice; each may be convicted only of those crimes for which he had the requisite mental state.").

Nevertheless, Alphin has failed to show that, if she was guilty, she was guilty only of aggravated assault. Alphin admitted, as previously discussed, that she intended to take Herrington's car. So, while the evidence may tend to prove that Alphin was guilty of some lesser offense, it did not show that offense to be only aggravated assault due to the robbery involved. *See Weaver*, 855 S.W.2d at 122. Instead, evidence tending to show Alphin did not intend to kill Herrington demonstrates the commission of aggravated robbery. This offense

19

consists of intentionally causing serious bodily injury while committing robbery. TEX. PENAL CODE ANN. § 29.03(a) (1).[18] The trial court did not err in refusing to submit the lesser-included offense of aggravated assault.

> (c)  *The Trial Court Did Not Err in Refusing to Submit the Lesser-Included Offense of Attempted Capital Murder*

Alphin further claims the trial court erred in refusing to submit an instruction on attempted capital murder, although no specific argument is made in support of this contention. Instead, Alphin relies, for each of her lesser-included offense claims, on *Beck v. Alabama*, 447 U.S. 625 (1980). *Beck* involved an Alabama death penalty statute which prohibited the trial court from giving the jury the option of convicting the defendant of a lesser-included offense. The court held that it is unconstitutional to impose a sentence of death after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser-included noncapital offense and the evidence would have supported the verdict. *Id.* *Beck* is distinguished from this case in at least three respects. First, this case does not involve the death penalty. Secondly, this case does not involve a statutory prohibition to the submission of lesser-included offenses. Finally, there is no evidence here that would warrant the submission of the lesser-included offense instructions Alphin requested.[19]

---

[18]Alphin does not raise an appellate point claiming entitlement to submission of the lesser-included offense instruction of aggravated robbery. Likewise, such a request was not made in the trial court.

[19]In *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005), the Texas Court of Criminal Appeals acknowledged the dilemma facing a jury when the choice is to convict for a greater offense in which the jury has a reasonable doubt or to release entirely from criminal liability an individual the jury believes to be a wrongdoer. Alphin complains the jury here faced this very dilemma, and, thus, a lesser-included offense instruction should have been given.

Criminal attempt occurs when a person, "with specific intent to commit an offense, . . . does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." TEX. PENAL CODE ANN. § 15.01(a) (West 2011). Had Herrington survived, Alphin would have been entitled to receive a lesser-included instruction on attempted capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a) (2). The trial court did not err in refusing to submit an instruction on attempted capital murder.

*(3)      No Claim of Improper Prosecutorial Comment During Closing Argument Was Preserved for Review*

In her final point of error, Alphin complains of improper comments by the State in closing argument, which, she claims, were not cured by the trial court's instruction to disregard. This complaint is based on the following exchange,

> [State's Attorney]:  He's shot.  He's down.  He's begging for his life. How desperate would someone to have be? [sic]  How desperate was Jason to be laying in a ditch, staring up at two killers, begging for his life?

> [Defense Counsel]:  Objection, Your Honor.  That's outside the scope of the evidence that he ever begged.

> THE COURT:  Sustained.

> [Defense Counsel]:  I ask the jury to be instructed to disregard that line of questioning.

> THE COURT:  All right.  The jury will disregard.  There is no evidence before the jury that there was any oral communication or begging by the decedent.

> [State's Attorney]:  Your Honor, the victim said, I'm hit, I'm hit.  The Defendant said that in her own statement.

> [Defense Counsel]:  Still, Your Honor, that's not begging.

21

[State's Attorney]: Why did you hit me?

THE COURT: All right. Well there was no evidence of begging so disregard the term "begging."

Alphin claims that, even though the trial court instructed the jury to disregard the comment that Herrington begged for his life, the instruction was rendered meaningless in light of the State's response, allegedly repeating the objectionable comment. Further, Alphin claims the trial court commented on the evidence in giving the instruction to disregard, further rendering the instruction meaningless.

The Texas Court of Criminal Appeals has held that, "before a defendant will be permitted to complain on appeal about an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling." *McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999). Generally, in order to preserve a complaint for appellate review, the record must show (1) that the complaint was made to the trial court by a request, objection, or motion that was timely and sufficiently specific to make the trial court aware of the grounds of the complaint and (2) that the trial court ruled adversely. *Tucker v. State*, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). If the objection is sustained, counsel must then ask for an instruction to disregard. *Nethery v. State*, 692 S.W.2d 686, 701 (Tex. Crim. App. 1985); *Schumacher v. State*, 72 S.W.3d 43, 47 (Tex. App.—Texarkana 2001, pet. ref'd). If the instruction is given, counsel must then move for a mistrial. *Id.* If counsel does not pursue the objection to an adverse ruling, error is not preserved. TEX. R. APP. P. 33.1; *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991).

22

Here, Alphin asked for and received an instruction to disregard. Alphin, thereafter, did not pursue her objection to an adverse ruling by moving for a mistrial. Accordingly, this point of error has not been preserved for our review.

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted:     November 12, 2012
Date Decided:      December 6, 2012

Do Not Publish